UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LIBERTY INTERNATIONAL
UNDERWRITERS,

        Plaintiff,

    v.

ERNEST D. CARLSON,

        Defendant.

CASE NO. C04-348JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on Defendant Ernest Carlson's motion for summary judgment (Dkt. # 42). Neither party has requested oral argument, and the court finds the motion appropriate for disposition on the basis of the parties' briefing and supporting evidence. For the reasons stated below, the court GRANTS Mr. Carlson's motion.

## II. BACKGROUND

More than 30 years after the Eagles first inquired, "Desperado, why don't you come to your senses?" Defendant Ernest Carlson wonders why his insurance carrier won't come to its senses about the DESPERADO, his 47-foot fishing boat. Eagles, Desperado Tr.5 (Elektra Entm't 1973). Mr. Carlson has submitted a claim to Plaintiff

ORDER – 1

Liberty International Underwriters ("Liberty") for more than $140,000 of water damage to the DESPERADO's deck. Liberty declined to pay the claim, and brought this declaratory judgment action to establish that it has no obligation to do so.

Between autumn 2001 and summer 2002, several incidents led Mr. Carlson to suspect that the DESPERADO's deck was damaged. Further investigation revealed that the fiberglass-laminated deck's plywood core had suffered extensive water damage. The problem, everyone agrees, was in the scuppers.[1] Water had leaked into the plywood core through the scuppers, and had likely been doing so for many years when Mr. Carlson first discovered it. There is no contention that the scuppers or the area at their margins were damaged or worn. Instead, because of an error in either the original design or construction of the deck, water could permeate the fiberglass laminate overlay for the deck where it met the fiberglass hull of the DESPERADO at the scuppers.

Since Mr. Carlson filed his first notice of claim with Liberty in July 2002, the parties have engaged in a lengthy negotiation process. Liberty has ultimately refused to pay the claim at least in part because it alleges that Mr. Carlson's policies do not cover the damage he sustained. Mr. Carlson brought this summary judgment motion seeking to establish, as a matter of law, that the damage to the DESPERADO is due to a "latent defect" within the meaning of his insurance policy.

## III. ANALYSIS

The policies in effect during the relevant time period contain an "Additional Perils" clause that covers, among other things "loss or damage to the Vessel directly

---

[1] A "scupper" is "[o]ne of the holes in a vessel's side at the level of the deck, to let water run off the deck." FUNK & WAGNALLS NEW STD. DICTIONARY OF THE ENGLISH LANGUAGE 2205 (1926 ed.).

ORDER – 2

caused by,"[2] among other things, "Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, *or any latent defect in the machinery or hull . . . .*" Carlson Decl. Ex. A (emphasis added). The policy language is a variation on the "Inchmaree" clause contained in many maritime insurance policies. Ferrante v. Detroit Fire & Marine Ins. Co., 125 F. Supp. 621, 622 & n.1 (S.D. Cal. 1954) (discussing the origin of the Inchmaree clause).

**A.   A Latent Defect is Any Defect that a Skilled Inspector Would Not Discover During a Reasonable Inspection.**

The legal question before the court is the definition of "latent defect" in Mr. Carlson's Inchmaree clause. Mr. Carlson contends that the cause of the damage to the DESPERADO was a latent defect in its hull – the inadequately sealed border between the hull and the deck at the scuppers. Liberty, however, contends that the defect was a design defect, and is not a latent defect as a matter of law.

On a motion for summary judgment, the court is constrained to draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The

---

[2]The copies of Mr. Carlson's policies that he provided to the court do not contain the words "directly caused by" in the Additional Perils clause. Carlson Decl. Ex. A. The parties have agreed, however, that the court should construe Mr. Carlson's policy as if it contained those words.

ORDER – 3

opposing party must present significant and probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991). When confronted with purely legal questions, the court does not defer to the non-moving party.

    **1.**    **Choice of Law**

At the outset, the court must decide whether state or federal maritime law governs the court's interpretation of Mr. Carlson's policies. In general, state law, not federal maritime law, governs the interpretation of insurance polices. Bank of San Pedro v. Forbes Westar, Inc., 53 F.3d 273, 275 (9th Cir. 1995) ("We, like Congress, leave the regulation of marine insurance where it has been - with the States.") (quoting Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 321 (1955). Absent a "federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice," state law governs the interpretation of a maritime insurance policy. Bohemia, Inc. v. Home Ins. Co., 725 F.2d 506, 509-10 (9th Cir. 1984); see also Kitma AS v. Royal Ins. Co., 9 P.3d 239, 242 (Wash. Ct. App. 2000) (noting that Washington choice of law rules employ the Wilburn Boat analysis). Washington courts defer to federal maritime rule where there is a need for uniformity. Kitma, 9 P.3d at 242 (applying federal maritime rule to dispute over insurance clause that was "particularly likely to arise between parties in different countries rather than in localized circumstances"). Because the need for uniformity in admiralty practice is not always apparent, "[w]hether federal or local law applies to a maritime insurance contract can present a troublesome question." Kalmbach, Inc. v. Insurance Co. of Pennsylvania, 529 F.2d 552, 554 (9th Cir. 1976).

The parties pay little or no attention to this "troublesome question." Mr. Carlson asserts that Washington law governs. Liberty cites no admiralty rule, federal statute, or

ORDER – 4

need for uniformity that would necessitate the application of federal law to Mr. Carlson's policy. Nonetheless, it cites a hodgepodge of decisions from federal courts exercising admiralty jurisdiction without ever expressly acknowledging the choice of law issues that Mr. Carlson's motion presents.

Fortunately, the choice between federal and state law in this action ultimately has no discernible impact on the issue before the court. If state law applies, the court will apply Washington law. Although Mr. Carlson used an Alaska address when entering the policies-in-suit (Carlson Decl. Ex. A), he contends that Washington law applies, and Liberty does not suggest another state whose law might govern this dispute.

State law must apply to the interpretation of Mr. Carlson's policy unless federal admiralty law displaces it. As to several bedrock principles of insurance law, federal maritime law is silent. The court therefore applies Washington's basic rules for construing insurance policies. Interpretation of policy language is a question of law for the court. Overton v. Consolidated Ins. Co., 38 P.3d 322, 325 (Wash. 2002). The court must give the terms of the policy a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." Id. (internal quotation omitted). Terms defined within a policy are to be construed as defined, while undefined terms are given their ordinary meaning. Boeing Co. v. Aetna Cas. & Sur. Co., 784 P.2d 507, 511 (Wash. 1990).

If the policy language on its face is fairly susceptible to two different, but reasonable interpretations, ambiguity exists, and the court will apply the interpretation most favorable to the insured. Allstate Ins. Co. v. Peasley, 932 P.2d 1244, 1246 (Wash. 1997) (cited in Petersen-Gonzales v. Garcia, 86 P.3d 210 (2004)); Allstate Ins. Co. v. Hammonds, 865 P.2d 560, 562 (Wash. Ct. App. 1994) (ambiguity exists "when, reading the contract as a whole, two reasonable and fair interpretations are possible."). A court

ORDER – 5

must construe ambiguity against the insurer "even where the insurer may have intended another meaning." Allstate Ins. Co., 865 P.2d at 562.

### 2. Federal and Washington Law Defining "Latent Defect"

With Washington's basic construction principles in mind, the court turns to the definition of "latent defect." Under Washington law, a latent defect is a defect "that could not have been discovered by inspection." Wright v. Safeco Ins. Co. of Am., 109 P.3d 1, 9 (Wash. Ct. App. 2004) (citation omitted). Every federal admiralty court interpreting an Inchmaree clause has come to the same conclusion. Beginning with the Fifth Circuit's decision in Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co. of Pennsylvania, courts have held that the latent defects the Inchmaree clause covers are defects "that could not be discovered by any known and customary test," or defects that "reasonably careful inspection will not reveal." 257 F.2d 116, 121 n.11 (5th Cir. 1957); Gibbar v. Calvert Fire Ins. Co., 623 F.2d 41, 44 (8th Cir. 1980). In the insurance context, courts "define the phrase ["latent defect"] in terms of the skill required to uncover the defect." Gibbar, 623 F.2d at 44 (contrasting other contexts in which a latent defect is "a flaw in the metal" or the material from which a product is made). Washington courts have come to the same conclusion when confronted with the term "latent defect" in an Inchmaree clause. In Pac. Dredging Co. v. Hurley, 397 P.2d 819, 825 (Wash. 1964), the court defined a latent defect as one that was "not discovered even though the vessel was properly surveyed for purposes of determining its seaworthiness and was properly maintained in repair by the owner."

Liberty points to no case in which a court construing "latent defect" in an insurance policy has arrived at a substantially different definition than in the cases cited above. Instead, Liberty contends that a design defect cannot be a latent defect as a matter of law. The cases it relies upon, however, provide no support for this conclusion. For

ORDER – 6

example, Liberty cites Bull Star Ltd. v. Jack Martin & Associates, Inc.. No. 03-2694, 2004 U.S. Dist. LEXIS 16682 (E.D. Pa. Aug. 19, 2004). In Bull Star, however, the court construed an insurance policy that expressly excluded coverage for "any manufacturing defects or defective or improper design." Id. at *10. The court acknowledges that several cases on which Liberty relies note that a latent defect "generally involves the material out of which the thing is constructed as distinguished from the results of wear and tear." E.g., Ferrante, 125 F. Supp. at 624 n.5; Reliance Ins. Co. v. Brickenkamp, 147 So. 2d 200, 202 (Fla. Dist. Ct. App. 1962). None of these cases hold, explicitly or implicitly, that a design defect cannot be a latent defect. At most, they stand for the proposition that defects that are caused by ordinary wear and tear cannot be latent defects. E.g., Sipowicz v. Wimble, 455 F. Supp. 442, 449 (S.D.N.Y. 1974) (finding no latent defect where fastenings and frames "had deteriorated from age, wear and lack of maintenance"). The court need not quarrel with this proposition, as the defect in this action was unquestionably not due to ordinary wear and tear.[3]

The court holds that a latent defect is a defect that a reasonably skilled shipowner would not discover during a reasonably careful inspection. The court emphasizes that the test for latency will be whether the policy holder would have discovered it in the exercise of ordinary care. See Gray v. Certain Underwriters at Lloyd's of London, No. 97-1130, 1999 U.S. Dist. LEXIS 411, at *12-14 (E.D. La. Jan. 15, 1999). In Gray, the court refused to hold a ship owner insured to the standard of a "shipbuilder, naval architect, composites expert, engineer, or other expert . . . ." Id. at *13. Gray does not bind the court, but the court is aware of no federal maritime rule holding ship owners to a higher

---

[3]That one might characterize the gradual rotting of the DESPERADO's hull as wear and tear is of no consequence. Mr. Carlson's policy covers all damage "directly caused by" a latent defect, whether the resulting damage is "wear and tear" or not.

ORDER – 7

standard. The language of the policy at issue here does not impose a higher standard of care, and thus Washington law requires the court to interpret the policy as an ordinary insurance purchaser would. Thus, to prove that the defect in the scuppers was a latent defect, Mr. Carlson need only prove that a reasonably prudent ship owner would not have discovered the defect during a reasonably careful inspection.

**B.      The Fortuity Doctrine Does Not Apply.**

Although Mr. Carlson brought the instant motion solely to clarify the meaning of "latent defect" in his polices, Liberty raises the unrelated argument that it need not cover Mr. Carlson's loss because the loss was not "fortuitous." Ordinarily, the court would decline to consider an argument not raised in a proper motion, but Liberty's "fortuity" contentions raise legal issues that are appropriate for disposition.

The fortuity principle, inherent in every insurance policy, is that an insurer need only cover losses that are the result of a fortuitous event, not losses that result from planned, intended, or anticipated events. Alcoa v. Aetna Cas. & Sur. Co., 998 P.2d 856, 878-79 (Wash. 2000). In Washington, the fortuity principle is called the "known risk principle." Id. at 878. It prevents "collect[ion] on an insurance claim for a loss *that the insured subjectively knew would occur at the time the insurance was purchased.*" Id. (citing Pub. Util. Dist. No. 1 v. Int'l Ins. Co., 881 P.2d 1020, 1030 (Wash. 1994)) (emphasis supplied).

Liberty has presented no evidence that Mr. Carlson "subjectively knew" that he would suffer the loss for which he seeks coverage. Instead, it argues that the damage to the deck was inevitable in light of the defect at the scuppers. This contention, even if Liberty proves it at trial, is insufficient to support a defense under the fortuity doctrine. Unless Liberty intends to submit evidence that Mr. Carlson knew, when he first

ORDER – 8

purchased insurance from Liberty, about the defect in the DESPERADO's scuppers and the damage it would cause, Liberty should not present a fortuity defense at trial.

**C.    The Upcoming Trial**

Mr. Carlson brought this motion solely to resolve legal questions, reserving factual disputes for trial. Nonetheless, because the court will sit as the trier of fact, the court offers the parties the following guidance in advance of trial.

At trial, Liberty will bear the burden of proving that a reasonably careful inspection by Mr. Carlson would have revealed the defect in the hull of the DESPERADO.[4] Based on the record before the court on this motion, there is no evidence that Mr. Carlson could have discovered the defect at the scuppers in the exercise of ordinary care. More importantly, however, the evidence demonstrates that a third-party inspector examined the DESPERADO for a valuation survey in July 2001 and found the vessel to be in excellent condition. He found no evidence of the defect at the scuppers. Liberty will thus have the unenviable task of showing that Mr. Carlson should have known about a defect that this inspector was unable to discover. See, e.g., Ocean Towing Co. v. Continental Ins. Co., No. 98-2819, 1992 U.S. Dist. LEXIS 2429, at *12 (E.D. La. Feb. 27, 1992) (finding, after a bench trial, that defect was latent where the "vessels were subjected to several more than adequate inspections" that did not reveal it).

---

[4] Liberty bears the burden of proof in this declaratory judgment action. Mr. Carlson bears the burden of proof on his counterclaims, which include a claim for breach of his insurance policies.

ORDER – 9

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS Mr. Carlson's motion for summary judgment (Dkt. # 42).

Dated this 6th day of February, 2006.

JAMES L. ROBART
United States District Judge

ORDER – 10