1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LIBERTY INTERNATIONAL
UNDERWRITERS,

                Plaintiff,

    v.

ERNEST D. CARLSON,

                Defendant.

CASE NO. C04-348JLR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I.  INTRODUCTION

This matter came before the court on a bench trial from February 13, 2006 through February 15, 2006.  After considering the evidence presented at trial and the parties' closing arguments, the court issues the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

1.    Plaintiff Liberty International Underwriters ("Liberty") is a New York corporation engaged in the business of selling, among other things, marine insurance policies. Liberty's principal place of business is in New York.

2.    Defendant Ernest Carlson is a resident of Bothell, Washington.  During the spring and summer, he is a commercial fisherman whose home port is Chignik, Alaska.

3.    Mr. Carlson owns the DESPERADO, a 47-foot fishing vessel.  Mr. Carlson bought the DESPERADO as a new vessel in 1982.  The DESPERADO has a molded

FINDINGS & CONCLUSIONS - 1

fiberglass hull.  Its deck is constructed of three-quarter-inch plywood with a laminated fiberglass overlay.  The deck fiberglass is bonded to the hull at the bulwarks, forming a weathertight deck surface.

4.    Mr. Carlson has purchased several marine insurance policies for the DESPERADO from Liberty.  His first Liberty policy took effect on May 15, 2001.  Ex. A-4.  His second Liberty policy, which took effect on the expiration of his first, took effect on May 15, 2002 and expired on May 15, 2003.  Ex. A-9.

5.    For at least one year prior to May 15, 2001, Mr. Carlson insured the DESPERADO through Albany Insurance Company, an entity that Liberty owns.  Ex. A-60.  For reasons not apparent to the court, Liberty represented in its trial brief that it did not know who had insured Mr. Carlson before May 2001.

6.    Mr. Carlson's insurance policies provided "named perils" as opposed to "all-risk" coverage.  All of his insurance policies contained language from the American Institute Hull Clauses of 1977.   In this dispute, the parties focused on the "Additional Perils" or "Inchmaree" clause, which provides as follows:

> Subject to the Conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by the following:
> Accidents in loading, discharging or handling cargo, or in bunkering;
> Accidents in going on off, or while on drydocks, graving docks, ways gridirons or pontoons;
> Explosions on shipboard or elsewhere;
> Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);
> Breakdown of or accident to nuclear installations or reactors not on board the insured Vessel;
> * * *
> provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them.

FINDINGS & CONCLUSIONS - 2

Ex. A-4 (May 15, 2001 to May 15, 2002 policy); Ex. A-9 (May 15, 2002 to May 15, 2003 policy).

7.   On July 17, 2001, Mr. Carlson commissioned a survey of the DESPERADO at the request of Liberty.  At the time, the DESPERADO was harbored in Chignik.  Matthew Siemion performed the survey.  Mr. Siemion had previously surveyed the DESPERADO in 1998.

8.   The court found Mr. Siemion to be very knowledgeable regarding fishing vessels.  His experience in surveying dates back to 1989, but his experience with fishing boats is lifelong.  In particular, Mr. Siemion demonstrated an exceptional knowledge of the fleet of fishing vessels in Chignik.

9.   Mr. Siemion conducted a thorough survey of the DESPERADO on July 17, 2001.  In the written report documenting his survey, he concluded as follows:

> The vessel is in **excellent** condition.  The cabin, rigging, and electronics are deluxe.  The hull, machinery, electrical arrangement and all accommodation spaces reflect considerable care, maintenance and upgrading.  All appropriate structures appear to be both sound and watertight.  Vessel shows normal wear with obvious pride in ownership.

Ex. A-61 (emphasis in original).  Mr. Siemion testified, and the court finds, that the DESPERADO's condition placed it in the top ten percent or five percent of vessels in the Chignik fleet.  Because the vessel was in such good condition, he had no recommendations for repairing or upgrading the DESPERADO.

10.   Mr. Carlson forwarded Mr. Siemion's report to Liberty.

11.   In 1998, Mr. Siemion had performed a survey on the ISLANDER, the sister vessel to the DESPERADO, which was also homeported in Chignik.  The structure of the ISLANDER is identical to the DESPERADO in all relevant respects.   Years after the survey, most likely in early 2001, the owner of the ISLANDER reported to Mr.

FINDINGS & CONCLUSIONS - 3

Siemion that a series of cracks had appeared in the hull at or near the ISLANDER's scuppers.  Water leaked through the cracks and damaged the plywood deck core beneath the fiberglass.

12. Based on his knowledge of the problems with the ISLANDER, Mr. Siemion informed Mr. Carlson during the July 17, 2001 survey that he should monitor the scuppers of the DESPERADO.  At the time, the DESPERADO exhibited no cracks near the scuppers or elsewhere on the deck.  Mr. Siemion had no idea when the DESPERADO might exhibit similar cracks.  Mr. Siemion did not recommend that Mr. Carlson take any preventative action to address the problem, nor did he note the issue in his survey report.

13. Mr. Carlson testified, and the court finds, that he either did not hear Mr. Siemion's admonition about the scuppers, or it made no impact on him and he did not remember it.  The court finds this testimony credible because Mr. Siemion stated that he did no more than tell Mr. Carlson to "keep an eye on" the scuppers.  He did not mention the likelihood of serious damage, and did not describe the potential problem in any detail.   He did not believe that the potential problem was even serious enough to note it in his survey report.  The court finds that Mr. Carlson took great pride in the maintenance of the DESPERADO, and that if he had believed that Mr. Siemion had warned him of a serious problem, he would have acted differently.  The court finds that Mr. Carlson did not know that the DESPERADO had a problem until he discovered the first crack in the fiberglass overlay in September 2001, and that he did not suspect that he had a serious problem until he spoke to Morris Jones, owner of the ISLANDER, in July or August 2002.

FINDINGS & CONCLUSIONS - 4

14. Based on Mr. Siemion's testimony and survey report, the court finds that there were no significant problems with the deck of the DESPERADO as of June 2001. There were no cracks or holes in the deck fiberglass that would permit water to leak into the plywood core of the deck. The plywood core was dry and sound.

15. When Mr. Carlson prepared the DESPERADO for winter dry dock in Chignik in September 2001, he noticed a hairline crack in the deck near the fish hold. He drilled an exploratory hole and some water came out. He investigated the source of the leak to the best of his ability. He did not believe that the problem was serious. He caulked the crack he had discovered and also applied caulking around other portions of the deck.

16. When Mr. Carlson returned to Chignik in spring 2002, he found water in his fish hold that appeared to have leaked at or near the hole he had drilled the previous fall. He conducted further investigation and found some sagging in the deck at the mast plate and at a purse davit. He installed a metal stiffener plate beneath the purse davit. He applied caulking and other sealants to cracks he found on the deck. He believed that he had fixed the problem, and did not believe that the problem was serious.

17. Mr. Carlson fished during the 2002 season, and continued to believe that any problem with the DESPERADO's deck was not serious. Sometime in late July or early August, he had a conversation with Mr. Jones. Mr. Jones told Mr. Carlson about the serious problems with water incursion into the ISLANDER's deck. At that time, Mr. Carlson became concerned that the cracks and leakage in his deck were evidence of a serious problem akin to the problems on the ISLANDER. Because he believed that the problem had been caused by a defect in his deck, he decided to make an insurance claim.

FINDINGS & CONCLUSIONS - 5

18.   Mr. Carlson contacted Darren Hopper, his insurance broker.  Mr. Hopper is a principal officer at Sea Mountain Insurance, a Seattle brokerage.  Mr. Hopper transmitted Mr. Carlson's claim to Liberty, indicating that the cause of the damage to the DESPERADO was a "manufacturer's defect."  Ex. A-11.

19.   Liberty dispatched Wayne Blomquist, a marine surveyor, to investigate Mr. Carlson's claim.  Mr. Blomquist came to Chignik on August 21, 2002.  He spent three hours surveying the DESPERADO.  Mr. Carlson was present and cooperated fully with Mr. Blomquist.  Mr. Blomquist concluded that there was substantial and likely irreversible damage to the plywood core of the deck, and attributed the damage to *freshwater* condensation below deck due to inadequate ventilation in the below deck holds.  Mr. Blomquist attributed the inadequate ventilation to the manufacture of the deck.  Mr. Blomquist believed that the deck would need to be replaced.  He did not believe that any course of routine maintenance would save the deck.  He prepared a report detailing his findings.  The report did not mention a "design defect," nor did it mention the DESPERADO's scuppers.  Ex. 1.  Mr. Blomquist sent the report to Liberty.

20.   The court finds that Mr. Blomquist surveyed the DESPERADO thoroughly, and that Mr. Blomquist was a knowledgeable and experienced surveyor.  Although he had knowledge of the water damage to the deck, and attempted to pinpoint the cause, he came to the conclusion that condensation below deck caused the damage. He did not suspect that leakage of seawater through the fiberglass overlay of the deck, whether at the scuppers or elsewhere, was a source of damage. The court finds that Mr. Blomquist's inability to pinpoint the deck as a source of leakage is strong evidence that Mr. Carlson could not have discovered the defect in the deck in the exercise of ordinary diligence by Mr. Carlson.  Indeed, Mr. Blomquist, a

FINDINGS & CONCLUSIONS - 6

skilled and experienced marine surveyor, could not discover the defect, even when he had knowledge of the damage and ample motivation to determine its cause.

21.  Mr. Blomquist testified that he could not adequately inspect the scuppers on August 21 because they were coated with caulking or "splash zone," a marine sealant.  Both Mr. Carlson's testimony and the pictures Mr. Blomquist took cast doubt on this assertion.  Nonetheless, the court finds that the presence of caulking or sealant at the scuppers would, if anything, have given Mr. Blomquist more reason to suspect the scuppers as a source of leakage.  Even so, he did not believe that the scuppers played any role in the damage he observed.

22.  Mr. Blomquist also surveyed the ISLANDER on August 21, 2002.  He reached the same conclusions regarding the damage to the ISLANDER's deck, and submitted a similar report to Liberty.  Ex. A-20a.  Again, he did not identify saltwater incursion through cracks in the fiberglass overlay of the deck as a cause of damage.  This is additional evidence that no one could have discovered the defect in the DESPERADO's deck (or in its deck-to-hull junction) through ordinary inspection.

23.  After receiving Mr. Blomquist's report, Liberty denied Mr. Carlson's claim in a September 12, 2002 letter.  Ex. A-17.  The letter repeated Mr. Blomquist's opinion of the cause of the damage, but also stated that Liberty viewed the damage as a "design defect."  The letter stated that a design defect was not a "named peril" under Mr. Carlson's policy.  Matthew Raia, a Liberty claims adjuster, wrote the September 12 letter, which concluded with the cryptic admonition that Liberty's "underwriters do not find it necessary to favor this claim."  Anthony Schiavone, Liberty's Vice-President for marine claims in North America, approved the letter

before Mr. Raia sent it.  On the same day, Liberty sent an identical denial letter to Mr. Jones, the owner of the ISLANDER.

24.   On June 3, 2003, Mr. Blomquist returned to Chignik to survey the DESPERADO again.  By this point, Mr. Blomquist had inspected the ISLANDER a second time as it underwent extensive deck repair.  Based on this inspection, he discovered that the deterioration of the deck was not due to freshwater condensation, but rather to leakage of saltwater through cracks in the fiberglass deck overlay.  After his June 2003 inspection of the DESPERADO, Mr. Blomquist completed a second survey report in which he retracted his opinion that the vessel sustained water damage due to inadequate ventilation.  He instead attributed the damage to leakage at the scuppers.  He opined that the defect at the scuppers was "a result of the method of original construction [of the DESPERADO]."  Ex. 2.  He did not use the phrase "design defect."

25.   In light of Liberty's refusal to pay on his claim, Mr. Carlson retained the services of Robert Bowden, an experienced marine average adjuster in Seattle.  He retained Mr. Bowden on the advice of his insurance broker, Mr. Hopper, who was not pleased that Liberty had denied Mr. Carlson's claim.  On Mr. Bowden's advice, Mr. Carlson also retained Thomas Laing, a marine surveyor in Seattle.

26.   Mr. Carlson decided to transport the DESPERADO to Seattle for deck repairs at the conclusion of the 2003 fishing season.  The Jensen Motor Boat Company ("Jensen") and Evavold Marine, LLC ("Evavold") performed the repairs.  During the winter of 2003-2004, Jensen and Evavold replaced the DESPERADO's deck in its entirety.

27.   During the fall and early winter of 2003, Mr. Bowden attempted to convince Liberty to reconsider its denial of Mr. Carlson's claim.  In the first formal response

to his efforts, Liberty sent him a letter on January 14, 2004.  Ex. A-31.  Liberty stated that "we are not honoring this claim, as our position has not changed."  The letter stated that because Mr. Carlson had suffered damage as a result of a "Design Defect," and that this was not a "named peril" under the policy.

28.   Mr. Bowden's efforts culminated in a January 12, 2004 "Statement of Particular Average" ("SOPA").  Ex. A-30.  Among other things, Mr. Bowden focused on demonstrating that the cause of the damage to the DESPERADO was a latent defect in the deck fiberglass overlay where it met the hull at the scuppers.  Mr. Bowden incorporated Mr. Laing's December 2003 survey report, which concluded that the DESPERADO's damage was due to water incursion from cracks in the deck as a result of an improperly designed junction of the deck to the hull at the scuppers.  Among other things, the SOPA noted that Liberty had lost in a March 2003 arbitration over its refusal to pay the similar claim for the ISLANDER, and noted that the arbitrator who heard the dispute provided substantial authority showing that Liberty's position that its policy did not cover design defects was in error.

29.   Mr. Laing concluded in his survey, and the court finds, that the cost of repairing the defect in the deck was no more than $2,000.  For that cost, one could extend the fiberglass overlay of the deck through the scuppers and down the exterior hull through the iron bark guard rail surrounding the hull.

30.   The court finds that by January 2004, all parties were in agreement that leakage from cracks in the scuppers had been the primary cause of the damage to the DESPERADO's deck.  Liberty's continuing denial of Mr. Carlson's claim was not due to a factual dispute, but rather to its insistence that a "design defect" could not be a "latent defect" covered under the insurance policy.

FINDINGS & CONCLUSIONS - 9

31.   The court finds that the cause of the damage to the DESPERADO was incursion of saltwater through the fiberglass overlay of the deck at cracks that opened at or near the scuppers.  These cracks opened because, either through design or manufacture, the junction of the fiberglass deck overlay to the hull at the scuppers was insufficient to withstand ordinary forces that the DESPERADO would face over its expected 80-year lifespan.  Once these cracks opened, the water incursion caused the fiberglass to delaminate from the plywood, which in turn led to more cracks and more water incursion.

32.   Mr. Blomquist observed the DESPERADO on several occasions during its repair. Based on his observations, he submitted a letter on January 16, 2004 to Lisa Blake, the Liberty claims adjuster then in charge of Mr. Carlson's claim.  Ex. 5.  In that letter, Mr. Blomquist concluded that the damage to the DESPERADO was due to a "defect in design."  Before then, Mr. Blomquist had not used that phrase or the phrase "design defect" in any correspondence with Liberty.

33.   In February 2004, Mr. Blomquist submitted a third report to Liberty.  Ex. 3.  In this report, he reiterated his conclusion from his January 2004 letter that the leakage at the scuppers was due to a design defect.  He also detailed the cost and progress of the Jensen and Evavold repair effort.

34.   On February 18, 2004, Liberty sent Mr. Bowden a final denial letter in response to his SOPA.  Ex. A-34.  In that letter, Liberty asserted that Mr. Carlson's loss was "a result of a defect in the vessel's design and construction, which materialized over a considerable period of time (over 20 years), rather than a sudden failure . . . ." Liberty had no support for this assertion, which was in direct contradiction to Mr. Siemion's 2001 survey, and greatly overstated Mr. Blomquist's opinion that the damage to the DESPERADO was ongoing for a few years, not for 20 years.

FINDINGS & CONCLUSIONS - 10

1   Liberty also asserted that Mr. Carlson's damage was due to "improper or lack of

2   maintenance" and "wear and tear."  Again, Liberty had no support for these

3   assertions.

4   35.   The court finds that the first cracks in the deck of the DESPERADO appeared no

5        earlier than June 18, 2001, the day after Mr. Siemion's survey.

6

7   36.   Mr. Blomquist submitted a fourth and final report to Liberty after observing the

8        DESPERADO for a final time on March 12, 2004, at or near the end of its repair.

9   37.   The court finds that Liberty's position that a "design defect" could not be a "latent

10       defect" was based solely upon Mr. Schiavone's belief.  Mr. Schiavone admitted

11       that neither he nor anyone at Liberty had made any effort to investigate legal

12       authority supporting (or not supporting) Mr. Schiavone's belief.  He did not

13       consult case law or treatises.  Although he knew that Mr. Carlson had purchased

14       his policy in Washington, Mr. Schiavone made no attempt to investigate

15       Washington insurance law.  At trial, Mr. Schiavone testified that a "latent defect"

16       is "a defect that would be undiscoverable by an individual with competent skills

17       who uses reasonable care in maintaining the vessel."  His definition is not

18       substantially different than the one the court adopted in its February 6, 2006

19       summary judgment order.  Mr. Schiavone, however, believed that manufacturing

20       defects and design defects were categorically excluded from the definition of

21       "latent defect."  He had no basis for this belief other than his personal conviction.

22  38.   In a March 2003 decision, a Seattle arbitrator rejected Mr. Schiavone's definition

23       of latent defect and ordered Liberty to pay for the damage to the ISLANDER.  The

24       arbitrator cited legal authority that, at a minimum, called Mr. Schiavone's

25       definition of "latent defect" into question.  Mr. Schiavone did not modify his

26

27

28

FINDINGS & CONCLUSIONS - 11

definition in light of the arbitrator's order, and instead attributed Liberty's arbitration loss to the inadequate efforts of defense counsel.

39. Mr. Schiavone admitted, and the court finds, that he paid less than full attention to Mr. Bowden's SOPA because he had already decided to deny Mr. Carlson's claim.

40. During this litigation, Liberty developed the theory that Mr. Carlson should have made a claim under his 2001-2002 policy, rather than his 2002-2003 policy. When Mr. Carlson agreed to make a second claim, Liberty insisted that the court delay trial so that it could investigate the second claim. Liberty performed no investigation of the second claim. The court finds that Liberty intentionally delayed trial in order to frustrate Mr. Carlson's efforts to recover on his claim.

41. Thomas Christo testified as an expert on insurance handling policy. In his opinion, Liberty repeatedly violated best practices in the insurance industry in the handling of Mr. Carlson's claim. Although the court found Mr. Christo's testimony credible and helpful, it is not necessary to make particular findings based on his testimony.

42. Mr. Carlson paid Jensen and Evavold $100,546.83 to repair the DESPERADO's deck, which includes the cost of the new deck. He paid $8,648.27 to transport the DESPERADO by barge from Chignik to Seattle. He paid $10,261.56 to transport the DESPERADO by barge from Seattle to Kodiak, Alaska. He claims $1,750 for the cost of moving the DESPERADO from Kodiak to Chignik, a sum that the court finds reasonable. He claims $2,000 for the cost of preparing the DESPERADO for repair, a sum that the court finds reasonable. He paid $779 to transport his new deck from its manufacturer in Hoquiam, Washington to the site of repair in Seattle. He paid $175.18 to moor the DESPERADO in Seattle around the time of repair. He paid Mr. Laing $3,710.20 for his survey, $89 to Mr. Blomquist for

reproductions of photographs he took of the DESPERADO, and $11,912.79 for Mr. Bowden's services.

43.   In early 2004, Mr. Carlson took out a loan for $108,200 to cover the cost of the repairs to the DESPERADO.  Ex. A-53.[1]  The loan carried an interest rate of 7.95% per year.  At the time of trial, Mr. Carlson had paid $11,250.03 in interest on the loan through the beginning of 2006, and the principal balance remaining was $86,560.00.

44.   Mr. Carlson claims that he lost fishing time in March 2004 while Jensen and Evavold completed the repairs.  The court finds that Mr. Carlson alone is responsible for any lost fishing time.

45.   Mr. Carlson's deductible under his Liberty policies was $6,000.

### III.  CONCLUSIONS OF LAW[2]

1.   The court has subject matter jurisdiction over this action pursuant to, inter alia, 28 U.S.C. § 1332(a).

2.   On February 6, 2006, the court entered an order granting Mr. Carlson's motion for summary judgment.  The court reaffirms that order here.  In particular, the court reaffirms its holding that a "latent defect" under Mr. Carlson's insurance policy is "a defect that a reasonably skilled shipowner would not discover during a reasonably careful inspection."

---

[1]The court notes that neither party moved to admit Exhibit A-53 into evidence. Nonetheless, Mr. Carlson's direct examination testimony regarding the loan clearly drew upon Exhibit A-53, and defense counsel questioned Mr. Carlson directly about the exhibit.  Because the court finds that Exhibit A-53 most accurately reflects information regarding the loan, and finds that its use will not prejudice either party, the court relies on the exhibit as if it had been admitted into evidence.

[2]In an effort to make the basis for its conclusions of law more clear to the parties, the court has included some subsidiary findings of fact along with the conclusions they support.

FINDINGS & CONCLUSIONS - 13

3.      A "design defect" is a "latent defect" if it meets the above definition, as is a manufacturing defect.

4.      In its February 6 order, the court noted that Liberty had not addressed the choice-of-law question in this case:  whether federal maritime law or Washington law should govern aspects of the insurance issues.  Despite that notice, Liberty continued to ignore the choice of law issues in its trial brief in this action.  Not until its closing argument did Liberty assert, for the first time, that federal maritime law should apply.

5.      The court reiterates its discussion of the choice of law issues from its February 6 order.  The court concludes that the outcome of this action would be the same whether it applied federal maritime law or Washington law.  As to several issues, the court will apply Washington law, in part because there is no indication that applying federal law would lead to a different outcome.  See Bohemia, Inc. v. Home Ins. Co., 725 F.2d 506, 509 n.2 (9th Cir. 1984) (noting that state law and federal law on insurance policy interpretation are usually the same).

6.      The court concludes that Washington's law regarding the interpretation of insurance policies applies.  Under Washington law, the court must give the terms of the policy a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." Overton v. Consolidated Ins. Co., 38 P.3d 322, 325 (Wash. 2002).  Where a policy is susceptible to more than one interpretation, the court must apply the interpretation most favorable to the insured.  Allstate Ins. Co. v. Peasley, 932 P.2d 1244, 1246 (Wash. 1997) (cited in Petersen-Gonzalez v. Garcia, 86 P.3d 210, 213 (Wash. Ct. App. 2004)).  A court must construe an ambiguity against the insurer "even where the insurer may have

FINDINGS & CONCLUSIONS - 14

intended a different meaning." <u>Allstate Ins. Co. v. Hammonds</u>, 865 P.2d 560, 562 (Wash. Ct. App. 1994).

7.  Liberty's position that a "latent defect," as the term is used in the Inchmaree clause of Mr. Carlson's policy, cannot be a design defect or manufacturing defect is not apparent from the plain language of the policy.  Liberty could have expressly defined the term "latent defect" in the policy, but it did not.  The term "latent defect" as used in Liberty's policy was at best ambiguous.  The court therefore cannot read the policy to categorically exclude design defects or manufacturing defects from the scope of the "latent defect" clause.

8.  The defect in the DESPERADO's hull was an improperly designed or manufactured junction between the fiberglass overlay of the deck and the hull at the scuppers.  Mr. Carlson could not have discovered this defect in the exercise of ordinary care.  The defect was therefore a "latent defect" within the meaning of the Inchmaree clause of Mr. Carlson's insurance policy.  The court need not determine whether this defect was a result of improper design or errors in the manufacturing process, as such a determination would not affect the outcome of this action.

9.  The deterioration of the DESPERADO's deck was due to cracks in the fiberglass deck overlay that were a result of the latent defect identified above.  This damage was irreversible from the time the cracks first appeared, which was sometime between Mr. Siemion's June 2001 survey and Mr. Blomquist's August 2002 survey.  None of the damage was attributable to Mr. Carlson's negligence, or to ordinary wear and tear.

10.  The cause of the damage to the DESPERADO's deck was a latent defect.  Under the policy, Liberty is liable for the cost of replacing the deck, minus the cost of

FINDINGS & CONCLUSIONS - 15

repairing the "defective part." As the court found above, the cost of repairing the defective part was $2,000.

11.   The court concludes that the fact that Mr. Carlson's insurance policy provided "named perils" as opposed to "all-risk" coverage is of no consequence. Under Washington law, the insured has the burden to prove that his loss is covered under a policy provision in any event. See Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 87 P.3d 774, 784 (Wash. Ct. App. 2004) (interpreting named perils policy). The burden is the same under federal law. Indem. Marine Assur. Co. v. Cadiente, 188 F.2d 741, 743 (9th Cir. 1951). Mr. Carlson has met his burden to show that his insurance policy covered his loss.

12.   The court concludes that the doctrine of *uberrimae fidei* does not limit Mr. Carlson's right to recover. The doctrine requires a marine insurance applicant "even if not asked, to reveal every fact within [his] knowledge that is material to the risk." Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d 412, 418 n.1 (9th Cir. 1998) (citation omitted). The court finds that Mr. Carlson had no undisclosed facts within his knowledge that were material to Liberty.[3]

13.   The court concludes that Mr. Carlson's loss was fortuitous. The court reiterates its holding regarding the fortuity doctrine from its February 6 order. The court finds

---

[3]The court notes that the applicability of the doctrine of *uberrimae fidei* is an open question. Compare C.N.R. Atkin v. Smith, 137 F.3d 1169, 1172 (9th Cir. 1998) (applying Cal. Ins. Code § 1900, which imposes a special duty on maritime insureds), with Cigna, 159 F.3d at 420 n.3 (declining to decide whether federal or state law governs *uberrimae fidei*). Although the Ninth Circuit has not resolved the issue, two district courts, including one in this district, have concluded that the doctrine applies as a matter of federal law. Port Lynch, Inc. v. New England Int'l Assurety, Inc., 754 F. Supp. 816, 820-23 (W.D. Wash. 1991) (Zilly, J.); Certain Underwriters at Lloyds v. Inlet Fisheries, Inc., 389 F. Supp. 2d 1145, 1163 (D. Alaska 2005).

FINDINGS & CONCLUSIONS - 16

that Mr. Carlson did not know that he would suffer a loss before he discovered the damage to the DESPERADO's deck.

14. The court concludes that no language in the policy excludes coverage for Mr. Carlson's loss.

15. Washington law governs Mr. Carlson's claim for bad faith denial of insurance coverage. See Bohemia, 725 F.2d at 511-12 (applying state law to a bad faith claim based on a marine insurance policy). A denial of coverage is in bad faith if it is unreasonable, frivolous, or unfounded. Overton, 38 P.3d at 329-30. In considering an insurance claim, an insurer must give equal consideration to the insured's interests and its own interests. Am. States Ins. Co. v. Symes of Silverdale, Inc., 78 P.3d 1266, 1270 (Wash. 2003). The Washington Administrative Code contains regulations governing the conduct of insurance companies in handling claims, and violation of those regulations is evidence of bad faith. See Coventry Assocs. v. Am. States Ins. Co., 961 P.2d 933, 935 (Wash. 1998) (citing, inter alia, WAC § 284-30-330).

16. The court concludes that Liberty acted in bad faith. The most serious of Liberty's transgressions was its steadfast refusal to conduct any investigation into whether it had a legal basis for its position that a design defect or manufacturing defect could not be a "latent defect" under Mr. Carlson's policy. The court finds that Liberty unreasonably refused to conduct even rudimentary legal research before repeatedly denying Mr. Carlson's claim, and that this is exemplary of bad faith. This conduct alone is sufficient to support a finding of bad faith, although the court notes that Mr. Carlson proved that Liberty took other actions that demonstrated bad faith, as reflected in the court's findings of fact.

FINDINGS & CONCLUSIONS - 17

17.   Liberty's bad faith harmed Mr. Carlson.  It forced him to hire Mr. Bowden and Mr. Laing to assist him in convincing Liberty to change its position.  Liberty's conduct also forced him to take out a loan to cover the cost of repairing the DESPERADO.  The court concludes that these costs are recoverable from Liberty as damages for its bad faith denial of coverage.

18.   The Washington Consumer Protection Act ("CPA") may also apply to an insurance company that denies coverage in bad faith.  Mr. Carlson must prove that Liberty "engaged in an unfair or deceptive act or practice occurring in trade or commerce that impacted the public interest and caused [him] injury in [his] business or property." Overton, 38 P.3d at 330 (citing RCW § 19.86.020); see also Indus. Indem. Co. of the N.W. v. Kallevig, 792 P.2d 520, 530 (Wash. 1990) (holding that a single violation of WAC § 284-30-330 is sufficient to support a CPA violation).  Washington courts have concluded that "the business of insurance affects the public interest . . . ." Kirk v. Mt. Airy Ins. Co., 951 P.2d 1124, 1126 (Wash. 1998).

19.   The court concludes that Mr. Carlson has shown that Liberty violated the CPA.  Under RCW § 19.86.020, Mr. Carlson is entitled to three times his actual damages, up to a maximum of $10,000.

## IV.  ORDER

Based on the foregoing findings of fact and conclusions of law, the court orders as follows:

1.   Mr. Carlson shall recover damages of $124,160.84, the cost of repairing the DESPERADO (including the cost of transporting and mooring the vessel, transportation of the new deck, and other related costs), less $6,000 for his deductible and $2,000 for the uncovered cost of the "defective part," the deck-to-

hull junction at the scuppers.  He shall also recover damages of $15,711.99, the combined cost of Mr. Laing's survey, Mr. Bowden's services, and Mr. Blomquist's photographs.   Mr. Carlson shall also recover $10,000 dollars in damages under the CPA.

2. Mr. Carlson is entitled to interest on the principal amount of $86,560 at an annual rate of 7.95% beginning on January 1, 2006, and continuing until Liberty satisfies the judgment in this action.  Mr. Carlson is entitled to $11,250.03 for interest paid prior to January 1, 2006.

3. Mr. Carlson may present a proposed judgment to the court within 10 days of this order.  If he does not, the court will enter judgment.

4. Mr. Carlson is entitled to his reasonable attorneys' fees and costs upon proper motion.

Dated this 13th day of March, 2006.

JAMES L. ROBART
United States District Judge

FINDINGS & CONCLUSIONS - 19